IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

G&T CONVEYOR COMPANY, INC.,

          Plaintiff,

      v.

ALLEGHENY COUNTY AIRPORT
AUTHORITY.

          Defendant.

C.A. No. 11 CV 562
**ELECTRONICALLY
FILED**

## MEMORANDUM OPINION RE:  PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 34 & 44)

### I.    INTRODUCTION

The present case is a contractual dispute between Plaintiff, G&T Conveyor Company, Inc. ("G&T"), and Defendant, Allegheny County Airport Authority ("ACAA").  On April 29, 2011, Plaintiff filed a one count Complaint before this Court, pursuant to 28 U.S.C. § 1332, alleging breach of contract for work it performed at the ACCA on baggage handling conveyors for a contract amount of $9,008,600.  Doc. No. 1.  On May 26, 2011, Defendant filed a Motion to Dismiss the Original Complaint (doc. no. 10), and on June 8, 2010, Plaintiff filed an Amended Complaint alleging Breach of Contract, and adding claims for Promissory Estoppel, Unjust Enrichment, and violation of the Pennsylvania Contractor and Subcontractors Payment Act. Doc. No. 15. On June 21, 2011, Defendant filed a Motion to Dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure (doc. no. 21), and on June 29, 2011, Plaintiff filed its Response in Opposition thereto.  Doc. No. 23.  On July 5, 2011, this Court granted in part, denied in part Defendant's Motion to Dismiss, and dismissed Plaintiff's cause of

action under the Pennsylvania Contractor and Subcontractors Payment Act while retaining all other claims in the Amended Complaint.  Doc. No. 25.

Currently pending before this Court are the parties' Cross Motions for Summary Judgment.  Doc. Nos. 34 & 44.  For the reasons set forth below, this Court will Grant Plaintiff's Motion for Partial Summary Judgment (doc. no . 34) and will Grant in Part, and Deny in Part Defendant's Motion for Summary Judgment (doc. no. 44).

## II.    FACTUAL BACKGROUND

The following facts are material and undisputed unless otherwise indicated herein.[1]

Plaintiff, G&T Conveyor Company, Inc. is a Florida corporation that designs, manufactures, and installs baggage-handling systems in airports throughout the United States. Doc. No. 15 ¶¶ 1, 6.  Defendant, ACAA, operates the Pittsburgh International Airport in Allegheny County, Pennsylvania.  *Id.* at ¶¶ 2, 7.  On August 2, 2007, the parties entered into a construction Contract for the North Baggage In-Line Explosive Detection System Project at the Pittsburgh International Airport, known as ACAA Project Number 59Q1-06-Equipment (the "Project"), at the agreed-upon price of $9,008,600.  *Id.* at ¶ 8; Doc. No. 45 ¶ 16.  The Contract[2] required G&T to construct and test a Baggage Handling System,[3] which included an in-line explosive detection system.  The Contract also required G&T to coordinate its efforts with other

---

[1] Pursuant to Local Rule 56, the parties were required to set forth a Joint Concise Statement of Material facts.  However, the factual statements were separately filed and were not "Jointly" filed.  The Court has attempted to fairly set forth the factual background, viewing the facts in the light most favorable to the non-moving party.

[2] The Contract Documents consisted of the Proposal; the Contract; the Performance, Payment and Maintenance Bonds; the conditions of the Contract; information or Instructions to Bidders; and all Specifications, Drawings and Plans. Doc. No. 36 ¶ 2.

[3] The Baggage Handling System was defined in the Technical Specifications to the contract as "all components, installation materials, interfaces and other components, all necessary hardware, software, installation coordination and construction supervision of PLC, controls and control hardware and software, management and support services required to implement the work and supply a fully functioning system as described by the Contract Documents." Doc. No. 45 ¶ 27; Ex. C., p. 10 ¶ 1.3(B)(1).

2

contractors and all appropriate government agencies,[4] as well as meet all technical specifications in the contract.[5]  Funding for the work performed by G&T was provided, in part, by the United States of America through the Transportation Safety Administration ("TSA") pursuant to a federally-funded grant, referenced in the Contract as an "Other Transaction Agreement" ("OTA"). Doc. No. 50 at 2.  The OTA established:

> [T]he respective cost-sharing obligations and other responsibilities of the TSA and the Airport Authority relating not only to the installation of integrated and non-integrated Explosives Detection Systems and Explosives Trade Detection equipment, but also to the improvements to be made to the existing systems in the baggage handling system at the North Landside Terminal at Pittsburgh International Airport.

> Doc. No. 50, Ex. 1, OTA, art. I.

Pursuant to the OTA, the TSA was responsible for reimbursing ACAA for 75% of all "allowable and allowable costs of the Project as set forth herein" up to a maximum of $3,400,000.  *Id.* at art. III. A.  However, the OTA mandates that title to the EDS and ETD security equipment, which includes the CTX, was to remain, as it does today with the TSA and not with ACAA.  *Id.* at art. III. A.3.

In order to construct the Baggage Handling System, G&T was required to install a "CTX" machine (the "CTX"), which is an explosive detection device that uses CAT scans and image processing software to screen checked baggage for explosives.  Doc. No. 36 ¶ 1. Although G&T was required to install the CTX, the Contract required that the TSA provide G&T

---

[4] "The Contractor (G&T) shall coordinate his operations and cooperate with other contractors working on the airport. Coordination with appropriate government . . . agencies is also required." Doc. No. 45 ¶ 19; Ex. G. Projection Manual § 800-08, ¶ D. "The BHS Contractor (G&T) shall closely coordinate with GE Infrastructure Security, the Owner and/or his representative and TSA for the CTX 9000 series model to be provided." Doc. No. 45 ¶ 25; Ex. C., p.2, ¶ 1.1(B)(6).

[5] "The BHS Specification and accompanying Contract Drawings are intended to outline the work, define functional requirements, and establish minimum standards of quality for the Project. The BHS Contractor shall assume full responsibility that the BHS, when completed, . . . assures a safe and efficient system for all personnel who operate, maintain or have access to it." Doc. No. 45 ¶ 21.  Ex. C., Technical Specifications, p. 1. ¶ 1.1(B)(1).

with the CTX for the Project.[6]  Doc. No. 36 ¶ 2.  The Contract also required that representatives

of the TSA inspect the Project.  Doc. No. 45 ¶ 18; Ex. G, Project Manual, §§ 800-08, ¶ D.

In early 2009, after installing the CTX and completing a substantial amount of work on

the Project, Plaintiff conducted a Pre-Integrated Site Acceptance Test ("ISAT").[7]  Doc. No. 15  ¶

9.  At the conclusion of the Pre-ISAT testing a number of bags returned a bag designation status

of "CTX unknown," which occurs when the CTX is unable to determine the content of a scanned

piece of luggage.  *Id.* at ¶¶ 6-7.  Once a piece of luggage is designated as a "CTX unknown," a

TSA employee in a Baggage Inspection Room must manually search it.  Doc. No. 45 ¶ 30.

Although a number of the Pre-ISAT results returned pieces of luggage with "CTX Unknown"

statuses,  Plaintiff,  BNP Associates, Inc. (on behalf of ACAA), and Carter-Burgess (on behalf of

TSA) each concluded that the results of the Pre-ISAT tests met the established site acceptance

criteria.  Doc. No. 36 ¶ 7.

After the completion of the pre-ISAT, Battelle, which was the commissioning agency for

the TSA on the Project, began the formal ISAT testing on the baggage handling system.[8]  Doc.

No. 15 ¶ 10.  In March of 2009, Battelle terminated the initial ISAT test prior to completion and

left the job site.  *Id.* at ¶ 8.  Although both parties admit that Battelle terminated the ISAT testing

(doc. no. 45 ¶ 42; doc. no. 36 ¶ 13), the parties dispute Battelle's reasons for terminating the

initial ISAT test.  ACAA contends that Battelle cited several reasons supporting its decision to

---

[6] The Contract stated that "[t]he TSA will procure the CTX9000 series devices, the BHS Contractor is required to coordinate with GE Infrastructure Security, the CTX 9000 device provider, is required to coordinate the details of the required interface(s) between the BHS and EDS systems in order to successfully accomplish the intended operation described herein." Doc. No. 36 ¶ 2.

[7] The pre-ISAT test and the ISAT test are systems tests conducted to determine if the requirements of the contract have been met and to ensure that the Baggage Handling system is functioning properly.

[8] The Contract required that: "[a]fter installation of the BHS, the BHS Contractor shall demonstrate its operating capability. The BHS Contractor shall have accomplished all 'debugging' and internal testing prior to the start of the Systems Acceptance Testing . . . The BHS Contractor shall make available to the Owner on a daily basis any and all records of internal testing and debugging (with corrective action) performed prior to Acceptance Testing.  Doc. No. 45, ¶ 31.

terminate the initial ISAT test, including: (1) an abnormally large number of CTX Unknown bags were observed throughout the line and system tests indicating a problem with the EDS/BHS interface; (2) a six percent (6%) unknown Error Rate;[9] (3) a number of incomplete BHS reports;[10] and, (4) a number of problems occurred with one of the dimensioning devices. Doc. No. 45 ¶ 8.  Moreover, ACAA contends that G&T was required to obtain and comply with the latest copy of the TSA ISAT procedures prior to the beginning of any testing.[11]  Doc. No. 45 ¶ 31.  However, G&T contends that the primary contributing factor to Battelle's halting the ISAT testing was a defect in the PLC[12] parameters settings in the CTX machines furnished for the Project.  Doc. No. 36 ¶ 9.  Additionally, G&T contends that the stoppage of ISAT testing was premature, which added significant costs to the project.  Doc. No. 36 ¶ 10.  Although the scope of G&T's work under the Contract did not change, G&T contends Battelle's termination of ISAT testing delayed G&T from completing its work for twenty-eight (28) days while the site-specific acceptance criteria in the original Contract was modified.  Doc. No. 15 ¶ 14.

The parties also disagree as to whether G&T was responsible for the delay.  G&T contends that any defect in the PLC parameters settings on the CTX was beyond its control, and that Battelle was solely responsible for prematurely terminating the ISAT testing.  Doc. No. 36 ¶¶ 11, 13.  G&T also contends that Battelle changed the site acceptance criteria outlined in the Contract, which caused the delay to G&T.  Id. at ¶ 12.  Moreover, G&T also contends that ACAA

---

[9] During the first 100-bag supplemental System Mixed Bag Test, four bags did not have a bag status. Additionally, two bags were lost, which resulted in the six percent-unknown error rate.  Doc. No. 45 ¶ 9.

[10] ACAA contends that BHS Reporting was not completed when testing commenced on March 3, 2009. Id. at ¶ 8.

[11] [G&T] shall assist the TSA in performing the mandated Site Acceptance Testing ("SAT") and Integrated System Acceptance Test ("ISAT"). The BHS Contractor shall be responsible for obtaining the latest copy of the TSA ISAT test procedure to ensure their completed EDS system meets all protocols and requirements contained within, prior to the TSAI SAT.  The BHS Contractor shall carry out a 'dry test run' of the ISAT prior to the TSA testing." Doc. No. 5 ¶ 31; Ex. C. p. 197, ¶ 3.11(A)(9)(b).

[12] To the best of this Court's knowledge PLC stands for Programmable Logic Controller, which is a digital computer used for automation of electromechanical processes.

5

allowed Battelle to change the site acceptance criteria, making ACAA responsible for any damages G&T incurred as a result of the delay. ACAA denies that Battelle terminated ISAT testing prematurely, and contends G&T is responsible for the termination. Specifically, ACAA contends that the excessive number of "CTX Unknown" bag statuses generated by the CTX were within the control of G&T because G&T was able to reduce the number of CTX Unknowns to "an acceptable level" after Battelle terminated the ISAT testing. Doc. No. 45 ¶¶ 11, 13.

As a result of the delay caused by the termination of ISAT testing, G&T filed the present action against ACAA seeking $173,042.27 (which represents a reduction from the $280,000 total for the full amount of delay damages), plus all applicable costs and fees. Doc. No. 15 ¶ 36.

### III.  LEGAL STANDARD

Summary judgment should be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.1994). In deciding whether there is a disputed issue of material fact, the Court must grant all reasonable inferences from the evidence to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Once the moving party has properly supported its showing that there is no triable issue of fact and demonstrated an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586.  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is so one sided that the movant must prevail as a matter of law.  It is on this standard that the Court has reviewed the parties Motions for Summary Judgment, Responses and Replies thereto.

## IV.   DISCUSSION

On September 15, 2011, G&T filed a Motion for Partial Summary Judgment asking this Court to rule as a matter of law that: (1) the twenty-eight (28) day delay on the project resulted from a defect in the CTX machine PLC's and a change in the Contract site acceptance criteria, and that ACAA is liable for any increased costs incurred by G&T to complete testing of the Baggage Handling System after the delay; and, (2) the Provisions within paragraph B, Scope of Work 6, of the Project Technical Specifications of G&T's Contract with ACAA do not require G&T to cover the costs of changes and/or interferences to either: (a) the bid set of plans and specifications for the Project, or the work undertaken under those plans and specifications; or, (b) the TSA's site acceptance criteria for its Site Specific Test Plan in effect prior to the commencement of ISAT testing in March of 2009.  Doc. No. 34.

7

On October 3, 2011, ACAA filed a Cross-Motion for Summary Judgment seeking this Court to grant its Motion for Summary Judgment on all counts in the Amended Complaint. Doc. No. 44.

After careful review of the facts, motions, briefs in support, and oppositions thereto, this Court will Grant Plaintiff's Motion for Partial Summary Judgment, will Deny Defendant's Motion for Summary Judgment as to Count I of the Amended Complaint, and will Grant Defendant's Motion for Summary Judgment as to Counts II and III.

The present dispute requires this Court to interpret the Contract entered into by the parties on August 2, 2007.  It is undisputed by the parties that Pennsylvania law governs the interpretation and construction of the Contract.  As the United States Court of Appeals for the Third Circuit has recognized, "Pennsylvania law on contract interpretation and ambiguity is somewhat complicated; while the broad principles are clear, it is not a seamless web." *Bohler-Uddehom America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001).  Contracts are interpreted to give effect to the intent of the contract of the parties. *See Hutchison v. Sunbeam Coal Corp.,* 519 A.2d 385, 389 (Pa. 1986).  In other words, a contract should be construed to give effect to its general purpose.  *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973).  "'[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone.'" *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) (quoting *E. Crossroads Center, Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965)).  "'[W]here language is clear and unambiguous, the focus on interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps silently intended.'"  *Bholer-Uddeholm*, 247 F.3d at 93 (quoting *E. Crossroads Center, Inc.*, 205 A.2d at 866) (emphasis in original). Thus, "[c]lear contractual terms that are capable of one reasonable interpretation must

be given effect without reference to matters outside the contract." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993) (internal citations omitted).  Therefore, a Court may only look outside the terms of the contract if the contractual terms are ambiguous.  *Id.*  As the Superior Court of Pennsylvania aptly stated, "[w]here the contract terms are ambiguous and susceptible of more than one reasonable interpretation, . . . the court is free to receive extrinsic evidence, i.e., parol evidence, to resolve the ambiguity." *Id.*   However, contractual terms:

> will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered by the mere fact that the parties do not agree on the proper construction.

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Family Partnership v. Meridian Bank*, 657 A.2d 17, 21-22 (1993)) (internal quotations omitted).

Contractual ambiguity can either be patent or latent.  *See Duquesne Light*, 66 F.3d at 614. "While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Duquesne Light*, 66 F.3d at 614). A party may use extrinsic evidence to prove a latent ambiguity, "but the evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *Id.*   Moreover, an interpretation of the ambiguous term must be reasonable; "In holding that an ambiguity is present in an agreement, a court must not rely upon a strained contrivancy to establish one; scarcely an agreement could be conceived that might not

9

be unreasonably contrived into the appearance of ambiguity. Thus, the meaning of language

cannot be distorted to establish the ambiguity." *Steuart*, 444 A.2d at 663.

    **A.  The "Contractor"/"Subcontractor" Status of the TSA and/or Battelle**

On October 3, 2011, this Court ordered the parties to submit supplemental cross-briefs on

the issue of whether the TSA and/or Battelle is a "Contractor" or "Subcontractor" under the

meaning of two specific clauses in the Contract, both of which limit the liability of ACAA.  The

specific "no damage for delay" clauses are as follows:

    Section 50-05 of the Project Manual states:

    Each Contractor involved shall assume all liability, financial or otherwise, in connection
    with his/her contract and shall protect and save harmless . . . the Airport Authority . . .
    from any and all damages that may arise because of inconvenience, delays, or loss
    experienced by him because of the presence and operations of other Contractors working
    within the limits of the same project.

    And Section 70-21 of the Project Manual states:

    Should the Contractor . . . cause damage or injury to the property or work of any other
    prime contractor or contractors, or by performing or failing to perform his work,
    including the work of his subcontractor or subcontractors hereunder with due diligence,
    delay or interference with any prime contractor or contractors who shall suffer additional
    expense or damage thereby, the parties involved in such dispute shall settle by agreement
    or arbitrate said claim, dispute or disputes . . . . The Airport Authority . . . shall not be a
    party to disputes or actions between prime contractors or subcontractor concerning such
    additional expense or damages.

The Contract, which as noted above includes multiple documents, contains several

definitions of  "Contractor" or "Subcontractor."  Specifically, Section 10-30 of the Project

Manual defines "Contractor" as follows:

    The individual, partnership, firm or corporation primarily liable for the work contracted
    and for the payment of all legal debts pertaining to the work who acts directly or through
    lawful agents or employees to complete the contract work.

Moreover, paragraph 4(e) of the Technical Specifications to the Contract provide that

"Other Contractor" or "Other" "shall mean a firm or person other than the BHS Contractor

10

(G&T) who shall enter or has entered into a Contract with the Owner (ACAA)."  Additionally,

Section 10-78 of the Project Manual defines the term "Subcontractor" as the "[p]arty supplying

labor and material or only labor for work at the site of the Project for and under separate contract

or agreement with the Contractor."[13]

    After a careful review of the facts and applicable law, this Court holds that the TSA

and/or Battelle are neither Contractors nor Subcontractors within the meaning of the Contract;

therefore, the "no damage for delay" clauses do not apply to the case at bar.

    ACAA contends that the TSA qualifies as a Contractor under the definition of "Other

Contractor" or "Other" found in paragraph 4(e) of the Technical Specifications.  Paragraph 4(e)

of the Technical Specifications defines "Other Contractor" or "Other" as "a firm or person other

than the BHS Contractor who shall enter or has entered into a Contract with" ACAA.  In order

for the TSA to be considered an "Other Contractor," a valid contract must exist between ACAA

and the TSA.

    On September 17, 2004, ACAA and the TSA entered into an "Other Transaction

Agreement," ("OTA") which is a grant agreement that provided, among other things, federal

funding for the Project.  Doc. No. 50-1. The OTA provided that the United States of America,

through the TSA, would reimburse seventy-five percent (75%) of allocable costs of the Project,

up to a maximum of $3,400,000.  Doc. No. 50-1, art. III ¶ A.  Additionally, the agreement

required the TSA to provide other services, including providing EDS and ETD equipment for the

Project.[14]  *Id.* at art. III, § B, ¶ 2.3.  In exchange for the services and funding provided by the

---

[13] Section 10-78 of the Project Manual continues as follows: "Nothing contained in the Contract
Documents shall create any contractual relationship between the Airport Authority and any subcontractor."
[14] The OTA required the TSA to provide the following services and equipment: 1) Review and approve
Project design specifications and construction contract documents to ensure that they comply with TSA
requirements; 2) Perform Factory Acceptance Testing of machines; 3) Acquire and deliver EDS and ETD
equipment to the site; 4) Place machines in final location in the BHS in accordance with TSA-approved
design specifications; 5) Provide commercially available Uninterruptible Power Supply hardware as

TSA, the ACAA agreed to allow the TSA to conduct testing and approve the baggage handling system to ensure it met TSA requirements under the Aviation and Transportation Security Act ("ATSA"). *Id.* at Art. III, § B, ¶¶ 2.7, 2.10.

The United States Court of Federal Claims has analyzed the nature of grant agreements under the Tucker Act.[15]  The Court of Federal Claims has concluded that in order for a grant agreement such as the OTA to be considered a contract, the agreement must meet, "the standards traditionally applied by the courts requiring mutual intent to contract, including an offer, acceptance and consideration." *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 419 (1995).  Moreover, "the party must demonstrate that the government representative who entered or ratified the agreement had authority to bind the United States in contract." *Id.* at 414 (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990)).

In the present case, a valid Contract exists between ACAA and the TSA because all of the requisite elements of a contract are present.  The TSA agreed to provide, and the ACAA agreed to accept, funding, services, and equipment in exchange for the TSA having the right to conduct testing and approve the baggage handling system to ensure it met the requirements under the ATSA.  Furthermore, the agreement was signed by the Contracting Officer of the TSA, who this Court holds has the authority to bind the United States.  Doc. No. 50-1 at 14.

---

required; 6) Install EDS operator consoles including but not limited to remote EDS consoles to facilitate on-screen resolution of Level TWO issues and prepare EDS's for test; 7) Set up and perform Site Acceptance Test for machine screening capabilities; 8) Provide technical support for integration of the EDS into the BHS; 9) Provide and install ETD equipment and all associated furniture in the operator console/ETD area; and, 10) Perform integrated site acceptance test of integrated system (EDS and BHS). Doc. No. 50-1 art. III, § B, ¶¶ 2.1-2.10.

[15] The Tucker Act "provides that the 'Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States, founded . . . upon any express or implied contract with the United States.'" *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 414 (1995) (quoting 28 U.S.C. § 1491(a)(1)).

Therefore, because a valid Contract exists between ACAA and the TSA, the TSA falls within the definition found in section 4(e) of the Technical Specifications of "Other Contractor" or "Other."

However, the TSA is not a "Contractor" for the purposes of the "no damage for delay" clauses found in sections 50-05 and 70-21 of the Project Manual.  As noted above, "[t]he alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable," *Bohler-Uddeholm*, 247 F.3d at 93, and this Court must refrain from interpreting "one provision of a contract in a manner which results in another portion being annulled." *LJL Transportation, Inc. v. Pilot Air Freight Corp*., 962 A.2d 639, 648 (Pa. 2009).

First, section 4 of the Technical Specifications states that the definitions contained under section 4 only apply to "these written Specifications" and "the Contract Drawings."[16]  Doc. No. 52-1 at 27, ¶ 4.  The Technical Specifications and Contract Drawings do not include the Project Manual, and therefore the definition of "Other Contractor" should not apply to the "no damage for delay" clauses found in sections 50-05 and 70-21 of the Project Manual.  Moreover, applying the definition of "Other Contractor" or "Other" found in section 4 of the Technical Specifications would conflict with the Provisions of the Project Manual.  The Project Manual defines "Contractor" as the "individual, partnership, firm, or corporation primarily liable for the acceptable performance of the work contracted and for the payment of all legal debts pertaining to the work who acts directly or through lawful agents or employees to complete the contractor work."  Doc. No. 50-2.  Thus, by holding that the definition of "Other Contractor" from section 4 of the Technical Specifications is synonymous with the definition of "Contractor" under section 10-30 of the Project Manual, this Court would effectively annul section 10-30 of the Project

---

[16] Section 4 of the Technical Specifications to the Project states: "In these written Specifications and on the Contract Drawings (unless inconsistent with the content or subject matter or unless a contrary intention otherwise appears) the following clarifications/definitions shall apply:"

Manual.  Thus, this Court cannot apply the definition of "Other Contractor" to the term "Contractor" in the Project Manual.  Therefore, although the TSA falls under the definition of "Other Contractor" as found in section 4 of the Technical Specifications to the Contract, that definition cannot be applied to the Project Manual.

In addition, Battelle, the commissioning agency for the TSA cannot be considered an "Other Contractor" under section 4 of the Technical Specifications.  Section 4 requires that a party enter into a contract with the ACAA in order to be considered an "Other Contractor."  Both parties agreed that Battelle did not have a contract with the ACAA, but was rather commissioned by the TSA to inspect the Baggage Handling System.  Therefore, because no contract existed between Battelle and ACAA, Battelle cannot be an "Other Contractor" under section 4(e) of the Technical Specifications.

Moreover, neither can the TSA nor Battelle be a Contractor under the definition provided under section 10-30 of the Project Manual.  Section 10-30 of the Project Manual defines "Contractor" as the "*individual, partnership, firm, or corporation primarily liable* for the acceptable performance of the work contracted and for the payment of all legal debts pertaining to the work who acts directly or through lawful agents or employees to complete the contractor work." Doc. No. 50-2 (emphasis added).

The Court emphasizes that a contract must be construed according to the ordinary meaning of its language.  *Empire Sanitary Landfill, Inc. v. Riverside Sch. Dist.*, 739 A.2d 651, 654 (Pa. Cmwlth. 1999).  In keeping therewith, the TSA is neither an individual, partnership, firm, or corporation.  Merriam Webster's Dictionary defines "individual" as "a particular being or thing as distinguished from a class, species, or collection."  Webster's New Collegiate Dictionary 615 (9th ed. 1988).  "Partnership" is defined as a "legal relation existing between two

or more persons contractually associated as joint principals in a business."*Id.* at 859.  "Firm" is defined as "a partnership of two or more persons not recognized as a legal person distinct from the members composing it."  *Id.* at 466.  "Corporation" is defined as a "body formed and authorized by law to act as a single person although constituted by one or more persons and legally cession."  *Id.* at 292.  Based on the common understanding of those terms, the TSA is neither an individual, partnership, firm or corporation.  Rather, the TSA is an agency under the United States Department of Homeland Security and is part of the Federal Government.  Because the TSA cannot be considered an individual, partnership, firm or corporation, it cannot be considered a "Contractor" under section 10-30 of the Project Manual.

In addition, other evidence in the Contract suggests that the parties did not intend to define the TSA as a "Contractor" for the purposes of the contract.  First, the TSA is listed under section 10-91 of the Project Manual, under the title "Abbreviations and Definitions."  Doc. No. 50-2 at 7, 9.  After review of the terms listed under this section, this Court could not identify one "Contractor" listed under section 10-91.  However, multiple government agencies, including the TSA, the Federal Highway Administration, and the United States Department of Transportation are listed under this section, indicating the parties' intent *not* to include government agencies as "Contractors" under the terms of the Project Manual.  Furthermore, section 10-39 of the Project Manual defines the Federal Aviation Administration ("FAA") as a government agency.  As G&T correctly points out, if government agencies such as the FAA or the TSA were intended to be "Contractors," there would be no need to set forth separate definitions for TSA and the FAA in the Contract.

More importantly, ACAA's own corporate designee failed to recognize the TSA or Battelle as "Contractors" under the Contract.  In the October 5, 2011, deposition of Thomas

Berndt, ACAA"s corporate designee under Federal Rule of Civil Procedure 30(b)(6), identified the "Contractors" on the Project as follows: 1) G&T was the contractor for the Baggage Handling System; 2) Nello was the General Contractor; 3) Kirby was the Electric Installation Contractor; 4) Brock was the Control Systems Contractor; and, 5) an HVAC Contractor and a Mechanical Installation Contractor that he could not recall. Doc. No. 50 at 8. Based on the foregoing evidence, this Court concludes that the TSA could not be a "Contractor" under the terms of the Contract, and thus the "no damage for delay" clauses found in sections 50-05 and 70-21 of the Project Manual do not apply to limit the liability in the case at bar.

In addition, Battelle does not qualify as a "Contractor" under section 10-30 of the Project Manual. In order to be a "Contractor" under that definition, the party must be "primarily liable" for the work contracted. Doc. No. 50-2 at 4. "Primarily" is defined by Webster's Dictionary as "for the most part," or "in the first place." Webster's New Collegiate Dictionary 934 (9th ed. 1988). Here, Battelle was not "primarily" liable for the inspections conducted on the Baggage Handling System. Rather, Battelle was contracted to do the work by the TSA, who had the primary responsibility of conducting ISAT tests on the Baggage Handling System, as outlined by the "OTA[17]." Doc. No. 50-1 at 6. Thus, because the TSA had the responsibility to conduct ISAT testing, and no other evidence has been provided by either party to contrary, Battelle cannot be primarily liable for the ISAT testing.

Finally, neither the TSA nor Battelle can be considered a "Subcontractor" under the terms of the Contract. Section 10-78 of the Project Manual defines "Subcontractor" as a "[p]arty supplying labor . . . under separate contract or agreement with the Contractor." Since neither

---

[17] Section 2.10 of the "OTA" requires the TSA to "[p]erform integrated site acceptance test [ISAT] of integrated system (EDS and BHS).

Battelle nor the TSA had a contract or agreement with a "Contractor" in this case, neither can be considered a "Subcontractor" under the Contract.

In summary, this Court holds that the TSA and Battelle are neither "Contractors" nor "Subcontractors" within the meaning of the Contract; therefore, the "no damage for delay" clauses do not apply to this dispute.

Additionally, the "no damage for delay" clause does not bar G&T's recovery of damages in this case.  Generally, a "no damage for delay" clause is enforceable. *James Corp. v. N. Allegheny Sch. Dist.*, 938 A.2d 474, 484 (Pa. Cmwlth. 2007).  However, Pennsylvania law precludes exculpatory provisions in the contract from being raised as a defense where "(1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act on some essential manner necessary to the prosecution of the work." *Id.* (citing *Henry Shenk Co. v. Erie County*, 319 Pa. 100, 178 A. 662 (1935)).  Accordingly, "affirmative or positive interference sufficient to overcome the 'no damages for delay clause' may involve availability, access or design problems that pre-existed the bidding process and were known by the owner but not by the contractor."  *Id.* (citing *Coatesville Contractors & Eng'rs, Inc. v. Borough of Ridley Park*, 509 Pa. 553, 506 A.2d 862 (1986)).  As discussed below, ACAA failed to ensure that the CTX machines provided by the TSA were working properly, and also, through its agent BNP, approved the pre-ISAT test results prior to Battelle's termination of the ISAT testing.  These "interferences" by ACAA contributed to the twenty-eight (28) day delay in ISAT testing, and thus, the "no damage for delay" clause does not apply.

**B.     ACAA is Liable for Damages G&T Suffered as a Result of the Twenty-Eight (28) Day Delay.**

G&T's Motion for Partial Summary Judgment asks this Court to hold that: 1) the twenty-eight (28) delay on the project resulted from a defect in the CTX machine PLC's and a change in the contract site acceptance criteria, and that ACAA is liable for any increased costs incurred by G&T to complete testing of the Baggage Handling System after the delay; and, 2) the Provisions within paragraph B, Scope of Work 6, of the Project Technical Specifications of G&T's contract with ACAA do not require G&T to cover the costs of changes and/or interferences to either: a) the bid set of plans and specifications for the Project, or the work undertaken under those plans and specifications; or, b) the TSA's site acceptance criteria for its Site Specific Test Plan in effect prior to the commencement of ISAT testing in March of 2009.   In essence, G&T asks this Court to hold ACAA liable for any damages it suffered as a result of the twenty-eight (28) day delay in ISAT testing.   On the other hand, ACAA's Motion for Summary Judgment asks this Court to require G&T to bear the costs associated with the aborted ISAT testing.   Thus, because both Motions request that this Court rule on the issue of contractual liability, both Motions will be addressed in turn below.

**1.   Plaintiff's Motion for Partial Summary Judgment**

G&T contends that the primary contributing factor to Battelle's decision to prematurely terminate ISAT testing was a defect in the PLC parameters of the CTX machine.   In support of its contention, G&T provides the deposition testimony of Thomas Somerville, the Director of Engineering and Construction for ACAA, who testified that "the primary contributing factor to [Battelle's premature termination of ISAT testing] was the failure of the government furnished equipment [CTX machines]."   Doc. No. 37-3 at 9.   In addition, an email sent from David Smith, who is the Product Area Lead for Systems Operation and Integration for Battelle, states that after

a high amount of CTX Unknown Statuses that occurred during ISAT Testing, Battelle

recommended to terminate ISAT Testing.  Doc. No. 48 at 28-30.  The email from Battelle fails to

indicate any other reason for terminating ISAT Testing.

However, ACAA contends that Battelle terminated the ISAT tests for a number of

reasons, including the number of CTX Unknown bag statuses, including: 1) A six percent (6%)

unknown Error Rate;[18] 2) a number of incomplete BHS reports;[19] and, 3) a number of problems

occurred with one of the dimensioning devices.  Doc. No. 45 ¶ 8.  Doc. No. 45 ¶ 40.

Even assuming that ACAA is correct that Battelle had numerous reasons for terminating

the ISAT testing, these reasons do not indicate that the terms of the Contract require that G&T

bear the responsibility for the termination of the tests and the costs of the resulting delay.

Indeed, the unrefuted evidence demonstrates that G&T was not responsible for the failing

PLC parameters in the CTX machines.  Rather, GE Infrastructures, and perhaps the TSA, are

responsible for the errors.  In an email from BNP, it notes that Battelle halted testing, that GE

programming caused at least some of the delay, and once the program was changed, the CTX

unknown statuses "lessened considerably."  Doc. No. 78, at 38.  Furthermore, the lack of BHS

reports, which was the second reason cited by Battelle for terminating the testing, also is not the

sole responsibility of G&T.  According to the email from Brian Schull, a Senior Project Manager

for SAI Consulting Engineers, Inc., Battelle actually stated that the reports would not be required

until the second week of testing, then two days later they cited the lack of reports as a reason for

the halt of the testing.  It is undisputed that Brock Solutions Engineering was responsible for the

production of the BHS reports, not G&T (albeit G&T had to provide "support" under the terms

---

[18] During the first 100-bag supplemental System Mixed Bag Test, four bags did not have a bag status.
Additionally, two bags were lost, which resulted in the six percent-unknown error rate.  Doc. No. 45 ¶ 9.
[19] ACAA contends that BHS Reporting was not completed when testing commenced on March 3, 2009.  *Id.*
at ¶ 8.

of the Contract).   See Doc. No. 45 at ¶ 53-54.   Third, as for the claim that problems with one

dimensioning device, as recognized by G&T, there was a problem with one dimensioning device,

which was the responsibility of G&T, and that is why G&T reduced the amount of its claim from

$280,000 to $13,042.27.

The facts and evidence establish that G&T is not responsible for, and did nothing to cause

or contribute to the delay, as a matter of law.   Instead, the Court finds that ACAA is responsible

for the delay.   First, ACAA provided the plans and specifications to the project, and ACAA

changed these parameters once Battelle terminated the testing.   In fact, the parties agree that "the

site acceptance criteria regarding 'CTX unknowns' designated by the CTX machines, was

designated as being an acceptable [or "valid"] bag status in Battelle's Site Specific Test Plan in

place prior to the commencement of the pre-ISAT testing in early 2009."   Doc. No. 45 at ¶6-7.

Second, and critically, ACAA had responsibility for overseeing the project and ensuring that all

parties involved complied with the plans and specifications.   Indeed, the applicable contractual

provisions demonstrate unambigiously that ACAA was bound to supervise the project.   The

Contract states as follows:   "Except for the responsibilities of the TSA as outlined below, the

Project will be managed by the Airport Authority, who will oversee the work.   The Airport

Authority is responsible for using its best efforts to have the Project completed within the

prescribed costs and schedule contained therein."   Doc. No. 50-1 at 5, ¶ B1.

The United States Court of Claims in *Luria Brothers & Co. v. United States*, 369 F.2d

701, 708 (Ct. Cl. 1966), in rejecting the project owner's attempt to avoid responsibility for delay

damages arising of hundreds of days of delays, stated that there is an "implied obligation

contained in every contract that neither party will do anything that will hinder or delay the other

party in the performance of the contract."   The Court held that the contractor "is of course

entitled to recover the damages which it incurred" because of changes which are necessitated by defective plans and specifications, and losses of productivity resulting from improper delays caused by the defendant [owner].  Applying the facts and the holding of *Luria* to the case at bar, yields the same conclusion by this Court: to wit  - - ACAA is liable for the twenty-eight (28) day delay, not G&T.

Lastly, G&T asks this Court to determine that paragraph B, Line 6 of the Technical Specifications does not require G&T to cover the costs of any delays caused by any changes to the site specifications or the TSA's site acceptance criteria.

Paragraph B, Line 6 of the Technical Specifications to the Contract states:

The TSA will procure the CTX9000 series devices, the BHS Contractor is required to coordinate with GE Infrastructure Security, the CTX 9000 device provider, as required to coordinate the details of the required interface(s) between the BHS and EDS systems in order to successfully accomplish the intended operation described herein. . . . The BHS Contractor shall closely coordinate with GE Infrastructure Security, the Owner and/or his representative and the TSA for the CTX 9000 series model to be provided.

G&T contends that the contractual obligation to "coordinate" with the TSA during the course of the project does not require G&T to absorb the cost of any delay that it did not cause. This Court agrees.  Under Pennsylvania law, this Court is required to give words their ordinary and popular meaning.  As the Supreme Court of Pennsylvania has noted, "[t]he standard for the interpretation of words is their natural meaning to the parties who have contracted at the time and place where the contract is made, considering all the circumstances surrounding it." *Urian v. Scranton Life Ins. Co.,* 310 Pa. 144, 165 A. 21, 22 (1933).

As defined in Webster's Collegiate Dictionary, "coordinate" means "to bring into a common, action, movement or condition; harmonize." Webster's New Collegiate Dictionary 288 (9th ed. 1988).  Under the ordinary definition of coordinate, there is no requirement of G&T to assume the risk of delay caused by another party. Moreover, in *C.J. Langenfelder & Sons Inc. v.*

21

*Commonwealth*, the Commonwealth Court of Pennsylvania held that "cooperate," a synonym of coordinate, did not relieve the owner of liability for delay damages. 404 A.2d 745, 751 (Pa. Commw. Ct. 1979).  The Court noted that "[w]hile it is true that the contract required [the contractor] to cooperate with pipeline owners in protecting their property, this provision cannot be read to relieve the [owner] of its obligation to provide an adequate design." *Id.*

Similarly, in this case, simply because paragraph B of the Technical Specifications to the Contract required G&T to "coordinate" its efforts with the TSA, does not relieve ACAA of liability for the delays G&T suffered.  Therefore, for the foregoing reasons, G&T's Motion for Partial Summary Judgment will be Granted.

## 2.  Defendant's Motion for Summary Judgment on Count I of Amended Complaint

 ACAA contends that G&T is responsible for any additional costs based on several contractual provisions.  However, there is not any contractual provision throughout the Contract that limits ACAA's liability, or requires G&T to bear the burden of any additional costs caused by the delay of a third party.

ACAA first contends that several contractual provisions that require G&T to deliver an "integrated turnkey system," require G&T to absorb the cost of the delay.  Specifically, ACAA relies on two paragraph 1.1(B)(1) of the Technical Specifications, which requires G&T to:

> Provide a complete, operable . . . system on a 'turnkey basis' . . . whether specifically shown and described, or implied in the plans and specifications or wherever required to effectively accomplish the intended functions of the BHS.

Doc. No. 45, ¶ 22.

As noted above, under Pennsylvania law, this Court is required to give words their ordinary and popular meaning.  As the Supreme Court of Pennsylvania has noted, "[t]he standard for the interpretation of words is their natural meaning to the parties who have contracted at the

time and place where the contract is made, considering all the circumstances surrounding it." *Urian v. Scranton Life Ins. Co.,* 310 Pa. 144, 165 A. 21, 22 (1933).

"Turnkey" is defined by Webster's Collegiate Dictionary as "built, supplied, or installed complete and ready to operate." Webster's New Collegiate Dictionary 1273 (9th ed. 1988). However, there is no contention by ACAA that G&T failed to provide a "turnkey integrated system." Rather, ACAA simply contends that this provision bars G&T from recovering any damages it may have sustained due to the twenty eight (28) day delay caused by the termination of ISAT testing. Although the term "turnkey" requires G&T to provide a complete and operable product at the end of construction, the term does not require G&T to absorb any costs associated with delays that it did not cause. Additionally, the use of this term in the Contract does not require G&T to absorb any costs that resulted from any changes to the plans and specifications. Therefore, ACAA's contention that paragraph 1.1(B)(1) of the Technical Specifications requires G&T to absorb the cost of the delay, is unconvincing.

ACAA also contends that paragraph 3.7 of the Technical Specifications requires G&T to absorb the cost of the delay. Paragraph 3.7 of the Technical Specifications states:

> This description of operation is intended to define the unique overall functional requirements of the BHS control system that are related to the operation of the EDS subsystems regardless of the type of EDS device installed. As set forth elsewhere in these specifications, the definitive architecture, detailed design and any/all coordination required for the control system design in its entirety including (but not limited to) the BHS-EDS interface requirements shall be the responsibility of the BHS contractor. It shall be the BHS Contractor's responsibility to tailor his system to meet the requirements of the EDS systems to ensure the functionality is provided as described herein. The operation described below shall be the primary operation for the system to be provided as a part of the scope of work specified herein.
>
> ***
>
> The BHS Contractor shall, as part of this work, provide and coordinate with the EDS equipment manufacturer as required to coordinate the details of the necessary interface(s) between the BHS and EDS systems in order to accomplish the intended operation

described herein.  The BHS Contractor shall, in all cases, be responsible for any wiring, communication bridges etc. between the BHS and EDS equipment systems that are required for those interfaces (hardware and software).

Doc. No. 45, ¶ 29.

Moreover, ACAA contends that section 800-08, Scope of Work, in the Project Manual, requires G&T to absorb any cost from a delay related to the CTX machines. Section 800-08 states:

The BHS Contractor shall assist the TSA in performing the mandated Site Acceptance Testing and Integrated System Acceptance Test.  The BHS Contractor shall be responsible for obtaining the latest copy of the TSA ISAT test procedure (i.e. Battelle Checked Baggage Inspection Systems Performance & Commissioning Plan) to ensure their completed EDS systems meets all protocols and requirements contained within, prior to the TSA ISAT.  The BHS Contractor shall carry out a 'dry test run' of the ISAT prior to the TSA testing.

Doc. No. 45 ¶ 19.

Although paragraph 3.7 of the Technical Specifications requires G&T to tailor the BHS to meet the requirements of the EDS systems, this clause does not require G&T to be responsible for changes in the site specifications and plans.  Similarly, section 800-08 of the Project Manual's mandate to assist the TSA in conducting ISAT testing does not require G&T to be responsible for any change in the plans or specifications or any interpretation thereof.

Section 50-02 of the Project Manual requires G&T to furnish all work and materials to "close conformity with the lines, grades, grading sections, cross sections, dimensions, material requirements, and testing requirements that are specified . . . in the contract, plans or specifications."  Doc. No. 50-2 at p. 10.  In the present case, both parties admit that at the time ISAT testing began, the site acceptance criteria regarded "CTX Unknown" bag statuses as valid or acceptable under the Contract.  Doc. No. 45 ¶ 6.  However, Battelle terminated ISAT testing due to a large number of "CTX Unknown" bag statuses, which required G&T to dedicate

additional time, labor, and money to reduce the number of "CTX Unknown" bag statuses.

Moreover, both BNP, on behalf of ACAA, and Carter-Burgess, on behalf of the TSA, approved

the results of the Pre-ISAT tests, which included a number of "CTX Unknowns."  BNP and

Carter-Burgess both concluded that "CTX Unknown" was a valid bag status and approved the

Project for ISAT testing.  Doc. No. 45 ¶¶ 6, 7.   Based on this evidence, the site acceptance

criteria changed after the Pre-ISAT testing.   Therefore, G&T cannot be held responsible for the

Battelle's decision to terminate ISAT testing based on a large number of "CTX Unknown" bag

statuses.

　　　For these reasons, ACAA's Motion for Summary Judgment to Count I of Plaintiff's

Amended Complaint will be Denied.

   *C.*　　　**ACAA's Motion for Summary Judgment on Counts II and III
   of Plaintiff's Amended Complaint**

　　　In Counts II and III of Plaintiff's Amended Complaint, G&T advances two additional

theories of liability.  G&T sets forth a Promissory Estoppel claim and an Unjust Enrichment

claim as "alternative" basis of liability.  As ACAA correctly argues, the Promissory Estoppel and

Unjust Enrichment claims are precluded when a valid contract exists.  *See MD Net v. Pharmacia

Corp.*, 147 Fed. Appx. 239 (3d Cir. 2005); *U.S. v. Kensington Hosp.*, 760 F. Supp. 1120 (E.D.

Pa. 1991).  In the present case, both parties agree that a valid contract exists. Doc. No. 15 at ¶ 8;

Doc. No. 45 ¶ 16. Therefore, Defendant's Motion for Summary Judgment as to Counts II and III

of Plaintiff's Amended Complaint will be Granted.

   **V.**　　　**CONCLUSION**

　　　For the reasons set forth hereinabove, this Court will Grant Plaintiff's Partial Motion for

Summary Judgment, Deny Defendant's Motion for Summary Judgment as to Count I of the

Amended Complaint, and Grant Defendant's Motion for Summary Judgment as to Counts II and

III of the Amended Complaint.

      An appropriate Order will follow.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc:    All Registered ECF Counsel and Parties